IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HAROLD SCHOENHAUS | ) | |
| and | ) | |
| RICHARD M. JAY | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 03-372-CRW |
| | ) | |
| GENESCO, INC. | ) | |
| and | ) | |
| JOHNSTON & MURPHY, INC. | ) | |
| | ) | |
| Defendants. | ) | |

BRIEF IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT OF NONINFRINGEMENT AND INVALIDITY

Mitchell G. Stockwell                     Thomas B. Kenworthy
Georgia Bar No. 682912                    (I.D. No. 18418)
Tywanda L. Harris                         MORGAN, LEWIS & BOCKIUS LLP
North Carolina Bar No. 26858              1701 Market Street
KILPATRICK STOCKTON LLP                   Philadelphia, Pennsylvania  19103
1100 Peachtree Street                     215 963-5702 telephone
Suite 2800                                215 963-5001 facsimile
Atlanta, Georgia  30309
404 815-6500 telephone
404 815-6555 facsimile

COUNSEL FOR DEFENDANTS

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 3

I.      Plaintiffs' Application For The 052 Patent. ................................................ 3

II.     The Difficult Prosecution of the 052 Patent Resulted in Numerous Changes. ................... 4

III.    The Structure and Characteristics of Genesco's Accused Inserts and Shoes. ................... 6

        A.      Genesco's soft cushion inserts are not rigid, tilted or "medially off set"
                with a deep heel seat. ................................................................ 6

        B.      The Genesco shoes in which the accused inserts are placed do not tilt a
                customer's foot the 5 degrees of "varus" required by the 052 Patent. .................... 7

IV.     Genesco Sourced the Accused Inserts Based on Industry Standard Inserts it and
        Others Had Used Long Before the 052 Patent. .............................................. 7

        A.      Genesco's "Sierra" shoe collection. ................................................... 7

        B.      Genesco's Copperstone shoe collection. ................................................ 8

        C.      Frelonic and related companies made other inserts similar to the accused
                inserts long before the 052 Patent. .................................................. 10

        D.      The accused inserts and shoes are based on the Copperstone shoe, and are
                virtually identical to the Frelonic inserts. .......................................... 10

V.      Plaintiffs Theory That The Shoe "Last" Creates Tilt Is Unsupported and
        Unsustainable. ......................................................................... 12

        A.      Plaintiffs' belated theory that the accused shoe tilts a customer's foot. .............. 12

        B.      Neither the accused shoes nor the lasts they are made from are tilted to
                create 5 degrees of "varus." ......................................................... 13

        C.      The dramatic differences between the tilted "prototype" shoe and the
                accused shoes confirms that no tilt is achieved in the accused shoes. .................. 13

VI.     The Prior Art Riggs Patent and Mizuno/Rose Shoe Predate the 052 Patent and
        Describe or Depict Every Element of the Claims. ........................................ 15

        A.      The Riggs Patent Invalidates the 052 Patent: ........................................ 15

        B.      The Mizuno/Rose Shoes Invalidate the 052 Patent: .................................... 16

ARGUMENT ................................................................................... 17

I.      Summary Judgment Readily Applies to Patent Cases. ..................................... 17

II.     Genesco Has Not Infringed the 052 Patent. ............................................. 17

        A.      Before considering noninfringement, the Court must construe the claims
                pursuant to the established rules of construction. .................................... 17

i

B. The Narrow Scope of the 052 Patent Claims Results in Multiple Grounds for Summarily Adjudging that Genesco Has Not Infringed. ............................... 18

C. Plaintiffs' failure to allege or adduce evidence of equivalents infringement precludes any such arguments at this late date, especially given their multiple and presumptively limiting claim amendments..................................... 27

III. Defendants Are Entitled to Summary Judgment Because the 052 Patent is Invalid ........ 28

A. Patentable inventions must be new and nonobvious.............................................. 28

B. Plaintiffs' Construction of the 052 Patent Results in its Claims Covering, and Being Invalidated by, Prior Art Sequoia, Copperstone and Frelonic Inserts and Shoes.................................................................................................... 29

C. Either of the Riggs Patent or Mizuno/Rose Shoe Anticipate and thus Invalidate the 052 Patent........................................................................................ 31

D. Even if Plaintiffs Could Identify Differences between the Prior Art and Their Claims, the 052 Patent is Invalid for Obviousness...................................... 32

CONCLUSION.................................................................................................................. 34

ATLLIB01 1671975.9

# TABLE OF AUTHORITIES

## Cases

*Aktiebolaget Karlstads Mekaniska Werkstad v. United States Int'l Trade Comm'n*, 705 F.2d 1565 (Fed. Cir. 1983) .................................................................. 32

*Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490 (Fed. Cir. 1986).............. 33

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001) ...... 30

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831 (Fed. Cir. 1984) ................................................................................................ 17

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443 (Fed. Cir. 1986)............. 29

*Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718 (Fed. Cir. 2002) ........................... 28

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002)...................... 18

*Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367 (Fed. Cir. 2002) ........... 28

*Digital Biometrics, Inc., v. Identix, Inc.*, 149 F.3d 1335 (Fed. Cir. 1998).................. 18

*Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693 (Fed. Cir. 1983) ......... 33

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002) .......... 28

*Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350 (Fed. Cir. 1999) ............................... 29

*Graham v. John Deere Co.*, 383 U.S. 1 (1966)................................................ 29, 32, 33

*In re Gorman*, 933 F.2d 982 (Fed. Cir. 1991)............................................................. 33

*In re Paulsen*, 30 F.3d 1475 (Fed. Cir. 1994) ............................................................ 25

*Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709 (Fed. Cir. 1999) .......... 19

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) .............................. 1, 17

*McCarty v. Lehigh Val. R.R.*, 160 U.S. 110 (1895) ................................................... 19

*Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757 (Fed. Cir. 1988) ............................. 32

*Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644 (Fed. Cir. 1994).............. 27, 28

*Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043 (Fed. Cir. 2001)................. 17

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir 2003) ......................... 18

*Peters v. Active Mfg. Co.*, 129 U.S. 530 (1889)......................................................... 31

*Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556 (Fed. Cir. 1986) ................... 31

*Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302 (Fed. Cir. 2002) ............... 17

*Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714 (Fed. Cir. 1991)................................ 32

*Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373 (Fed. Cir. 2003)......................... 28

*Sterner Lighting, Inc. v. Allied Elec. Supply, Inc.*, 431 F.2d 539 (5th Cir. 1970)........ 30

*Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002)............... 18

iii

*Unique Concepts, Inc. v. Brown*, 939 F.2d 1558 (Fed. Cir. 1991) ......................................... 20, 26

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ...................................... 18

*Vivid Techs., Inc. v. Am. Sci. & Eng'g*, 200 F.3d 795 (Fed. Cir. 1999) ...................................... 29

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997) ............................... 27

*White v. Dunbar*, 119 U.S. 47 (1886) ......................................................................... 30

*York Prods., Inc., v. Cent. Tractor Farm and Family Crt.*, 99 F.3d 1568 (Fed. Cir. 1996) ......... 17

**Statutes**

35 U.S.C. § 102 ....................................................................................... 28, 29, 31

35 U.S.C. § 103 ........................................................................................... 29, 32

35 U.S.C. § 112 ............................................................................................... 20

35 U.S.C. § 282 ............................................................................................... 29

Fed. R. Civ. P. 37(c)(1) ..................................................................................... 27

Fed. R. Civ. P. 56(c) ........................................................................................ 17

**Other Authorities**

*Manual of Patent Examining Procedure* § 608.01(m) (8th ed. rev. 1) ........................................ 1

ATLLIB01 1671975.9

## <u>INTRODUCTION</u>

This is a patent infringement action in which Plaintiffs contend that various shoes sold by Defendants Genesco, Inc. and Johnson & Murphy ("Genesco") infringe claims 1 and 2 of U.S. Patent No. 5,174,052 (the "052 Patent"). The features of the accused products are not in dispute. Because a number of the elements of claims 1 and 2 of the 052 Patent as properly construed are not found in the accused products, Genesco is entitled to summary judgment of noninfringement. Additionally, if the claims of the 052 Patent were construed broadly enough to encompass the accused products, they would be invalid. The design of Genesco's insert is that of an industry-standard shoe insert that has been used well over a year before the application that resulted in the 052 Patent was filed. Genesco thus seeks summary judgment of noninfringement and invalidity.

Before addressing the dispositive issues, this brief construes certain key claim terms of the 052 Patent.[1] *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) (courts must construe a patent, including terms of art therein). Genesco then demonstrates why, under any conceivable claim construction, Genesco's shoes cannot infringe as a matter of law. Similarly, this brief explains why the patent is invalid in view of prior art never considered during its acquisition. These issues are summarized below.

<u>Noninfringement</u>: This case concerns a simple, generic and industry-standard shoe insert that Genesco has used since the late 1980s. Plaintiffs' patent was not even filed until 1991; they thus accuse of infringement only those Genesco products that have been sold since the mid-1990s. Those products contain a generic, cushion insert, an exemplary version of which is

---

[1] A patent contains a (1) a written description of the invention that often includes drawings and (2) patent claims. The description explains the invention so that others versed in the technology can make and use it. 35 U.S.C. § 112. Patent claims are numbered single sentences located at the description's end that stake out the boundaries of the patent holder's property. Exhibit ("Ex.") 10, *Manual of Patent Examining Procedure* § 608.01(m) (8th ed. rev. 1).

1

shown in the photo to the right.  *See* Ex. 41, at
ex. B.  The Genesco insert is soft.  It is flat, not
tilted.  It has sides or flanges that extend only to
the mid-part of the foot.  Those flanges are the
same thickness.  No flange is "off set" or built



up to tilt the wearer's foot.  Genesco's insert -- and the shoes in which they are placed -- aim

merely to cushion the foot, rather than act as an orthotic device or prevent hyperpronation.[2]

These features are evident from the accused products.  They are thus indisputable.

They are also material.  Plaintiffs, in prosecuting their patent application, amended the

052 Patent to cover only a <u>rigid</u> orthotic device that prevented hyperpronation via (1) an off-set

or thickened inside flange that tilts the foot to the outside of the body and (2) uniformly high and

lengthy flanges.  Plaintiffs then told the Patent Office, and later Genesco, that these were critical

features.  These critical features are, however, absent in the accused inserts.  On the established

record, Genesco is entitled to summary judgment of noninfringement.

<u>Invalidity</u>:  Genesco's inserts are virtually identical to inserts that it -- and other shoe

companies -- placed in shoes made or sold in the 1980s.  These prior art inserts are materially

identical to the inserts that Plaintiffs accuse of
infringement, as reflected in the photo here of a
Copperstone insert.  *See* Ex. 55A.



Thus, under any interpretation that Plaintiffs

could possibly advocate for their patent, Plaintiffs' claims would be invalid in view of the prior

art inserts long used by Genesco and other shoe companies in the industry.

---

[2] Hyperpronation is simply excessive pronation, which involves an inward rotation of the foot beyond normal.
Exhibit ("Ex.") 45, at ¶ 8.

2

Genesco has also identified prior art orthotic devices that describe or depict exactly the features described by Plaintiffs' patent. This prior art consists of a "Riggs" patent that predates Plaintiffs'. It also consists of a shoe made by the Mizuno company. Pete Rose wore such a shoe in the 1985 game in which he broke Ty Cobb's all time hit record. Each of the Riggs patent and Mizuno/Rose shoe predate the 052 Patent; each embody every feature claimed therein. The features of the physical Mizuno/Rose shoe and the description of the Riggs patent cannot be disputed. Thus, on the undisputed facts of record, the 052 Patent is invalid as a matter of law.

## STATEMENT OF FACTS

### I.     Plaintiffs' Application For The 052 Patent.

1.     Addendum I hereto reproduces claim 1 of the 052 Patent. Plaintiffs filed the patent application on January 3, 1991. Ex. 1. The 052 Patent "relates to an orthopedic device for the prevention of hyperpronation," which is excessive flattening of the arch. *Id.* at 1:5-6. It describes a "deep heel seat [that] is off set to maintain the calcaneus[3] in an inverted position but allow normal pronation to occur. The lateral flanges of the present device extend[] to the neck of the metatarsals." *Id.* at 2:40-44. According to the 052 Patent, "[t]he present invention thus deals with the position of the calcaneus, and its off set insert within the cup, as well as the lateral flange extending to the fifth metatarsal neck." *Id.* at 3:9-11.



2.     Fig. 12, shown above, depicts the 5 degree of tilting accomplished by Plaintiffs'

---

[3] The 052 Patent is referenced by [column]:[line number]. It is full of medical jargon that is explained simply and clearly by Dr. Smith, Genesco's expert. *See* Ex. 45, at ¶ 8. For instance, calcaneus is the heel bone. *Id.* at ¶ 8.

ATLLIB01 1671975.9

"off set" orthotic device.  Ex. 3, at 02014.  Figure 14 shows the high inside flange, while Figure

17, reproduced below, shows how the outside flange extends to the fifth metatarsal (e.g., at the

little toe).  *Id.* at 02016.

        3.      "An important difference in

[Plaintiffs'] product from the ones in the prior

art is in the prevention of the lateral drift with

the use of the lateral stabilizing flanges and the

inverted off set heel cup."  Ex. 1, at 4:63-6.  The



lat. view

patent explains that off setting "is accomplished by shaping the cup so that the medial leg (6) of

the orthotic device rises more steeply from the bottom of the cup (1) then [sic, than] does the

lateral leg (2).  This tends to shift the point of engagement of the bottom of the calcaneus with

respect to the bottom of the cup so that it is in an inverted position of approximately 5 degrees

from the normal vertical."  *Id.* at 5:15-21; *see also id.* at Figs. 9-10.

## II.      The Difficult Prosecution of the 052 Patent Resulted in Numerous Changes.

        4.      Original claim 1 of the Doctors' application did not require the tilting of the foot

by "5 degrees of varus" to be accomplished in any particular way or require a particular length or

structure of the flanges.  *See*  Ex. 3, at 15:2-7 (Application, claim 1); *see also* Addendum I.

        5.      The Patent Office rejected those claims.  Ex. 4.  The Examiner said an article

written by one of the inventors, the "Jay" reference, as well as various prior patents rendered the

claims unpatentable.  *Id.* at 3-5.  Plaintiffs responded by narrowing their claims to require their

flanges to be longer and "extend to the first and fifth metatarsal necks."  Ex. 5, at 2.  Because

Plaintiffs admitted Mosher and Scheinhaus "teach holding the calcaneus at approximately 5

degrees varus," their argument focused on the alleged absence of long outside or lateral flanges.

*Id.* at 4-5.   Brown, whose insert is shown in Figure 12 (ex. 25), was distinguished as having short flanges.  *Id.* at 5.

6.      A second action rejected the claims on essentially the same bases.  Ex. 6. Plaintiffs further narrowed claim 1, adding the requirement that the heel cup be "medially offset and laterally tilted by a sufficient amount" to tilt the heel bone 5 degrees and that the "high medial flange apply[] a stabilizing force to the navicular plantarly and said medial and lateral flanges serving" to prevent the foot from moving to the outer or lateral side.  Ex. 7, at 1-2.

7.      Plaintiffs vigorously argued that these were material changes.  First, the changes were said to differentiate the orthotic shown in the Jay article, which they said had flanges that were too short and too low.  *Id.* at 4-5; *see also* ex. 35.  They also argued that their invention had a "lateral flange [that] is uniform in height as it goes from the heel cup to the neck of the fifth metatarsal and neck of the first metatarsal. This is a significant difference as compared to Dr. Jay's [prior] article" because the high flange must be long to provide the control needed.  *Id.* at 6. Similarly, Plaintiffs urged that "[i]t is critical that the medial flange extend from the heel cup to the metatarsal neck" to provide control.  *Id.* at 8-9.  Additional remarks emphasized the importance of the length and height of the flange to control the foot bones.  *Id.* at 10-12.

8.      Plaintiffs said prior patents to Mosher and Scheinhaus used "extrinsic wedges" on the bottom of the heel cup between shoe and orthotic to tilt or provide varus.  *Id.* at 6-7.  By contrast, Plaintiffs tilted the foot "by offsetting the heel cup itself intrinsically."  *Id.* at 6-7 (Emphasis original). At page 9, Plaintiffs reiterated the importance of this feature, saying that "the claims, as now amended, include the medial off set of the heel cup which is critical to the differences discussed above." *Id.* (Emphasis original).

9.      After this lengthy response, the Examiner granted an interview.  Therein, the
Plaintiffs  "agreed to amend claim 1 as in the attached Examiner's Amendment to overcome the
previous rejection."  Ex. 8.   The Examiner added the word "rigid" to the deep heel seat and
required the flanges to extend "continuously high along the medial and lateral sides of the
orthotic substantially to the first and fifth metatarsal necks, respectively."  Ex. 8, at 3.  The
Examiner then explained why he was allowing the patent, (*id.* at 3-4), first noting the many
similarities between the Jay article and the claims, but stating that: "None of the prior art of
record teaches or suggests such high medial and lateral flanges extending for the claimed length
of the orthotic and therefore it would not have been obvious to one of ordinary skill in the art to
modify Jay to have the claimed flanges as there is no motivation to do so."

10.      The cumulative result of this prosecution is reflected in Addendum I hereto,
which shows the many amendments to the original claim 1.

## III.    The Structure and Characteristics of Genesco's Accused Inserts and Shoes.

### A.    Genesco's soft cushion inserts are not rigid, tilted or "medially off set" with a deep heel seat.

11.      Dr. Smith, Genesco's expert, inspected each available sample of the accused
shoes and each insert therein.  He explains that each of the inserts is made of a soft, yieldable and
cushiony material, namely EVA.  Ex. 45, at ¶ 12.  *See also* Ex. 23 at 376:1-377:3; exs. 15-16, 31-
34 and 52 (photos of accused shoes); ex. 41 (actual samples of accused inserts).  EVA is widely
used in shoes.  It is consistently described as a cushioning material that provides a soft,
comfortable insert.  Ex. 45, at ¶ 12; ex. 19, at 125:7-14; ex. 20, at 110:13-17, 153:12-25.

12.      None of the accused inserts have an off set and laterally tilted heel seat or medial
flange.  Ex. 45, at ¶ 19. None have a deep, rigid heel seat or high flanges that extend
continuously to the required portion of the foot.  *Id.* at ¶ 24.  To the contrary, the accused inserts

ATLLIB01 1671975.9

all have flanges of uniform thickness and are all made of soft and yieldable material.  The inserts are not orthotic devices and are incapable of applying the forces described in Claim 1 of the 052 Patent.  *Id.* at ¶¶ 16, 25 and 26; *see also* Ex. 19, at 55:22-56:1; ex. 20, at 115:4-117:21.

> **B.    The Genesco shoes in which the accused inserts are placed do not tilt a customer's foot the 5 degrees of "varus" required by the 052 Patent.**

13.    Mr. Roy Helton is responsible for product development at Genesco's Johnston and Murphy division and has spent over 40 years creating men's shoes.  Ex. 19, at 7:7-9.  Mr. Helton explained that the accused shoes do not tilt a customer's foot, but instead are designed to, and do, sit flat on the ground.  *Id.* at 92:21-93:12, 109:18-110:1, 166:22-25.  Other witnesses agreed.  Ex. 20, at 219:7-14; ex. 40, at ¶ 26.

14.    Dr. Smith tested the accused shoes and likewise concluded that none of those shoes tilted a patient's foot to a 5 degree (or smaller) angle.  Ex. 45, at ¶ 22.  Dr. Smith then tested the accused inserts in three commercially available casual shoes such as those made by Rockport, Cole Haan and Timberland.  No tilting resulted.  *Id.* at ¶ 45.  The inserts from these commercially-available shoes are similar in shape and material to the accused inserts.  *Id.* at ¶ 45. He placed those inserts in the accused Genesco shoes.   Unsurprisingly, no tilting resulted.  *Id.* at ¶ 46.  Genesco's shoes have no effect on foot pronation.  *Id.*

## IV.    Genesco Sourced the Accused Inserts Based on Industry Standard Inserts it and Others Had Used Long Before the 052 Patent.

> **A.    Genesco's "Sierra" shoe collection.**

15.    Mr. James Vinson, a former Genesco employee, explained that Johnston & Murphy's target market had always been the "brown shoe" portion of the industry – referring to men's dress and casual shoes as opposed to athletic shoes.  Ex. 22, at 8:22-9:2; 25:14-26:19.  In the mid-1980s features developed in athletic shoes began to migrate to the "brown shoe" part of

the business.  *Id.* at 29:6-30:4.  Rockport and others introduced cushion inserts with flanges.  *Id.* at 29:11-18, 38:17-39:1; *see also* Ex. 19, at 229:20-229:2 and Ex. 29.

16.      In 1988, Mr. Vinson surveyed store managers and learned that consumers wanted an insert that would enhance the comfort features of the shoe.  Ex. 22, at 28:11-22; 30:5-12.  Genesco did not aim to address foot pronation with such an insert.  *Id.* at 30:25-31:17.

17.      Mr. Vinson and others began developing a "deerskin" collection of casual men's shoes.  *Id.* at 31:24-32:6.  Those shoes were first depicted in a 1989 catalogue Genesco published for buyers.  *Id.* at 32:32-33:17 and ex. 56 (catalogue).  The insert shown in the catalogue was a standard insert sourced from a component supplier Mr. Vinson located at a trade show.  *Id.* at 34:9-36:23.  The same insert was used in a Sierra collection shoe shown in a "fall, 1989/winter, 1990" catalogue, a photo from which is depicted here to show the insert.  *Id.* at 40:25-41:6; Ex. 57.



18.      The Sequoia insert "would be relatively the same" as the accused Genesco insert except for the material.  *Id.* at 39:2-20.  Mr. Roy Helton was also involved in developing the Sequoia shoe.  He provided a 1988 memo that attaches a description sheet (ex. 30) for the Sequoia line of shoes.  Ex. 19, at 270:1-272:17.  The memo describes the insert as a "3/4 polyurethane insert" (*id.*), the same description used on the "Copperstone insert" described below and demonstrated to be comparable to the accused inserts.   Ex. 55A.

**B.      Genesco's Copperstone shoe collection.**

19.      Genesco sells thousands of different types of shoes every year.  Genesco has not found a Sequoia or Sonoma shoe yet due to the long delay between creation of those shoes and

ATLLIB01 1671975.9

this suit.  But, Genesco has located an actual "Copperstone" shoe, ex. 55, with an insert, ex. 55A, developed in 1989.

20.     Mr. Vinson authenticated the Copperstone shoe, exhibit 55, which was part of his personal collection.  Ex. 22, at 8:6-18; 41:15-43:16.  He explained that the first Copperstone shoe was created in mid-1989.  *Id.* at 44:3-11.  Mr. Vinson learned of the insert in that shoe at a trade show attended by the insert's maker, the Frelonic company.  *Id.* at 46:10-16.  In October 1989, Mr. Vinson met with the sales force at Genesco to present the Copperstone concept; they approved it.  *Id.* at 51:25-53:12.  On November 21, 1989, he authorized purchase of several hundred "Frelonic three-quarter charcoal polyethylene insert[s]."  *Id.* at 45:14-46:5; 50:11-25; ex. 58.

21.     Exhibit 58 shows the Frelonic inserts purchased for Copperstone shoes were to arrive at Genesco's factory by January 2, 1990.  *See also* Ex. 22, at 54:19-55:25.  Sales samples were created in early February 1990.  *Id.* at 57:14-58:22.  They are shown in catalogues published by Genesco in the Fall of 1990.  *Id.* at 59:2-61:16; exs. 59-60.  That timing fits with other evidence.  *See* Ex. 61; Ex. 22, at 63:11-72:4.

22.     The Copperstone shoe that is Exhibit 55 and its insert, Exhibit 55A, were made between May and July, 1990 as part of "fit" trials.  Ex. 22, at 72:5-73:10.  However, there is no substantial difference between the fall, 1989, prototype and the spring 1990 Exhibit 55 shoe, except for length.  *Id.* at 74:6-77:16.  The insert used in both Exhibit 55 and the prototype shoe was identical.  *Id.* at 76:14-23; 180:6-24.

23.     The Copperstone insert is similar, if not identical in all material respects, to various of the inserts Plaintiffs accuse.  Ex. 22, at 78:7-81:11; ex.19, at 122:15-124:20; 236:8-23 and 272:18-273:21; ex. 45, at ¶¶ 43 and 44.

**C.    Frelonic and related companies made other inserts similar to the accused inserts long before the 052 Patent.**

24.    Mr. Vinson purchased the Copperstone insert from Frelonic.  Ex. 22, at 54:19-55:25; Ex. 58.  Dertex Corporation ("Dertex") acquired Frelonic's assets in 1997, including its business records, molds and cutting dies.  Ex. 42, at ¶¶ 4-5.

25.    Mr. Sturman of Dertex located documents demonstrating production of inserts before the application for the 052 Patent.  *Id*. at ¶¶  8-10.  The mold used to make those inserts was created in 1985 and remains in use by Dertex.  *Id*. at ¶¶ 10-11.  Dertex no longer has an actual pre-1990 insert.  It did, however, use the pre-1990 molds and materials available in that time frame to manufacture several versions of a "Universal" insert.  *Id*. at ¶¶ 13-15; Ex. 62.  One insert thereby produced from the pre-1990 molds is depicted in the photo to the right.  *See id*. at ¶ 15 and ex. F.



26.    Mr. Sturman compared the Frelonic inserts with the accused Genesco inserts, such as the one shown to the right (ex. 41, at ex. A).  As with the Copperstone insert, *supra*, he found that Genesco's accused inserts are virtually the same.  *Id*. at ¶ 17.



**D.    The accused inserts and shoes are based on the Copperstone shoe, and are virtually identical to the Frelonic inserts.**

27.    In the spring of 1995, Genesco began developing the Crossings shoe Collection, which Plaintiffs say infringe.  Ex. 20, at 33:14-18.  The Crossings Collection was based on the design of a traditional moccasin and was to compete with Cole Haan's shoes.  Ex. 20, 88:5-12; ex. 21, at 46:1-16, 217:18-218:1.  Mr. Don Roney, a former Genesco employee who developed

10

the Crossings shoes, designed the insert in the Crossings Collection around the insert in the Copperstone shoe. Ex. 21, at 47:7-19. Crossings shoes were made in Mexico, so Genesco sourced the inserts out of Mexico to avoid import duties. Ex. 21, at 49:14-50:7, 205:4-15. The insert was selected from the supplier as opposed to one that Genesco developed. Ex. 20, 47:3-21, 48:18-22; ex. 21, at 49:14-25; 205:16-21.

28.     Mr. Roney also had to have the manufacturer develop a "last" or mold around which the leather could be formed to make the shoe. Ex. 21, at 46:17-47:6, 58:17-59:23. The standard practice in the shoe industry is to create a last for a new shoe line by basing the last on an older model last. Ex. 19, at 43:2-47:25; ex. 21, at 50:22-51:9, 203:7-10; ex. 22, at 24:10-25-9; ex. 40, at ¶¶ 14-17. Genesco followed this practice in developing the last for manufacturing the Crossings shoes. Ex. 20, at 89:10-16; ex. 21, at 203:11-15.

29.     The Crossings collection lasts were ultimately called the "Wicklow III" lasts and are in the record as exhibits 17-18. Ex. 21, at 56:2-10. The basis for the Wicklow III last was the last used to create the Copperstone shoe. *Id.* at 52:19-21, 203:11-15; *see also* Ex. 19, at 102:6-19; ex. 20, at 88:11-90:25. The main change to the Wicklow III last was to the toe shape – a change necessitated by the "moccasin" look of the Crossings shoes. Ex. 20, at 89:14-16; ex. 21, at 218:3-10, 218:21-23.   However, consistent with Genesco's general practice of creating lasts, the back or heel part of the Copperstone last was left unchanged and the Mexican manufacturer simply replicated that part in the Wicklow III last. Ex. 19, at 102:12-19; ex. 20, at 88:13-16, 90:18-24, 97:24-98:13.

11

**V.** **Plaintiffs Theory That The Shoe "Last" Creates Tilt Is Unsupported and Unsustainable.**

    **A.** **Plaintiffs' belated theory that the accused <u>shoe</u> tilts a customer's foot.**

30.     Plaintiffs sued Genesco in January 2003. Their claims of patent infringement have always focused upon the inserts. Their interrogatory responses does not identify the structure of the shoe as creating infringement, but focus exclusively on the insert. Ex. 53, at 10-11.

31.     Genesco deposed each of the Plaintiffs last fall, taking Dr. Jay's deposition first. He swore that the "last" or form used to make Genesco's shoes had nothing to do with his belief that his patent was infringed. Ex. 23, at 348:14-349:9, 350:14-351:5. To the contrary, he repeatedly claimed that infringement could be determined by visual inspection of some inserts (*id.* at 300:1, 359:7-302:5,:16-370:23) or, for others, by his personally observing the effect of the shoe on a user's foot (*id.* at 279:5-24, 29:11-20), although he had not performed such observations of Genesco's accused shoes. *Id.* at 341:11-14.

32.     Dr. Schoenhaus testified, however, that he inspected documents at Genesco in October 2003 – months after this litigation began and months after Plaintiffs had accused Genesco's inserts. Ex. 24, at 135:12-136:12. At the inspection, Dr. Schoenhaus saw the "Wicklow III lasts" and he claimed these lasts were replicas of lasts modified in the early 1990s during discussions between Genesco and the doctors. *Id.* at 136:13-17; 137:11-138:15.

33.     Dr. Schoenhaus admittedly had no evidence to support his theory, other than his understanding that the Wicklow III lasts were used to make most of the accused shoes (*id.* at 137:5-10) and his claim that he could tell those lasts had "inverted" heels. *Id.* at 139:10-140:5. His basis for this claim that the heel was inverted was his assertion that you could "bisect" the

last and measure a 5 degree angle via a protractor or by "eyeballing" it. *Id.* at 142:16-145:12.

No other witness has managed to duplicate his feat of eyeballing the last to discern such a tilt.

**B.     Neither the accused shoes nor the lasts they are made from are tilted to create 5 degrees of "varus."**

34.     Dr. Schoenhaus' theory has no foundation, is inadmissible and is wrong.

35.     First, the accused Crossings shoe collection was based upon the insert used in the Copperstone collection as well as the heel portion of the Copperstone last. *Supra*, at ¶¶ 28-29.

36.     Mr. Allen Smith, Genesco's last expert, confirms that the Wicklow III lasts are very similar in the back heel part to a last used before the 052 Patent to create the Copperstone shoes. Ex. 40, at ¶¶ 18-26. He located a 1985 last that is virtually identical to the original Copperstone shoe last. Ex. 40, at ¶ 21 and Exs. C-1 through C-10. Mr. Smith has compared the dimensions and structure of the back, heel part of this 1985 last and determined that it is virtually identical to the back part of the Wicklow III lasts. *Id.* at ¶¶ 22-25 and ex. D-1.

37.     Second, Mr. Helton explained at length why the accused shoes do not demonstrate a "tilted" or inverted heel. Ex. 19, at 109:18-110:1, 166:22-167:6, *see infra* at ¶ 44.

38.     Genesco's experts agree. Their tests unequivocally demonstrate that neither the shoes, nor the inserts nor the Wicklow III lasts cause any tilt, varus or inversion in a wearer's heel part. Ex. 40, at ¶¶ 18-26 ; ex 45, at ¶¶ 19-23.

**C.     The dramatic differences between the tilted "prototype" shoe and the accused shoes confirms that no tilt is achieved in the accused shoes.**

39.     The prototype shoe Dr. Schoenhaus referenced also demonstrates that the accused shoes do not have any built-in "tilt" or varus. That prototype shoe, ex. 13, resulted from a series of communications between the Plaintiffs and Genesco in the early 1990s when the Plaintiffs contacted Genesco seeking to license their invention. *See* exs. 11, 12, 36 and 37.

ATLLIB01 1671975.9

40.     After meeting with Mr. Helton, Dr. Schoenhaus forwarded to Mr. Helton a copy of the doctors' patent application.  Ex. 38.  In March 1992, Mr. Helton received legal advice that Plaintiffs' patent application was limited to an orthotic that (1) created tilt of 5 degrees and (2) had long flanges.  Exs. 46 and 47, ex. 19, at 168:14-170:21.  This orthotic is shown in Exhibit 2, the Plaintiffs' prototype device.

41.     Mr. Helton forwarded counsel's memo to Dr. Schoenhaus and asked for a response to the issues raised.  Ex. 48; ex. 19, at 170:11-21.  Dr. Schoenhaus and Mr. Wilson spoke and, according to Mr. Wilson's April 6, 1992, file memorandum "Dr. Schoenhaus said that the length of the flanges and the degree of varus are critical to the correct function of the device." Ex. 49.

42.     Genesco thereafter proceeded with manufacturing a prototype shoe that would have the desired tilt or "varus."  That shoe was made in April 1992.  Ex. 19, at 172:23-25.  The prototype shoe is shown in photographs attached as Exhibit 13, and is the shoe on the right side of the photo shown here.  Unlike the



accused shoe (on the left), the prototype exhibits tilting – visible from the angled seam running up the back of the shoe.  Ex. 13,  Ex. 19, at 173:15-20.

43.     Dr. Smith has measured the tilt of the prototype to be about 4 degrees.  Ex. 45, at ¶ 27.  He has compared its obvious and dramatic tilt to the accused shoes, none of which manifest that tilt.  *Id.* at ¶ 28.  Mr. Smith, the last expert, agreed.  Ex. 40, at ¶ 26.

14

44.     Similarly, Mr. Helton compared the prototype shoe's construction to the accused shoes.  Mr. Helton explained, and demonstrated, how the heels on the accused shoes rest squarely on a flat surface.  Ex. 19, at 83:16-87:4, 90:4-10; 92:22-93:17 and ex. 26.  Those heels are symmetrical in construction and interchangeable – Genesco does not make a right heel for a right shoe and a left heel for a left shoe.  Ex. 19, at 58:15-59:5.  By contrast, the tilt built into the prototype shoe requires each of a pair of shoes to have a special heel.  *Id.* at 90:17-91:25 and exs. 27-28.  Mr. Helton pointed to Plaintiffs' "Langer" orthotic device as an example of a tilted insert that requires individualized heels, pointing out that the plaster cast on the bottom of the Langer device shows customization to account for the tilt or varus in the orthotic.  Ex. 19, at 58:18-25.

45.     Without such custom heels, a truly tilted insert or shoe will be unstable – it will rock back-and-forth, exactly as the prototype shoe does.  *Id.* at 58:15-59:5:  The accused shoes do not exhibit that rocking because their heels are flat.  *Id*. at 92:22-93:17.

## VI.     The Prior Art Riggs Patent and Mizuno/Rose Shoe Predate the 052 Patent and Describe or Depict Every Element of the Claims.

### A.     The Riggs Patent Invalidates the 052 Patent:

46.     U.S. Patent No. 4,235,028 to Riggs ("Riggs") was filed October 30, 1978 and issued November 25, 1980.  Ex. 14.  The Patent Office did not consider the Riggs patent when it issued the 052 Patent.  Ex. 1.

47.     Riggs discloses "an orthotic stabilizer for an athletic shoe comprising a semi-rigid body formed to fit around and under the wearer's heel above the mid-sole forming a concave pocket for receiving the heel and extending from the heel along approximately two-thirds the length of the foot."  Ex. 14 (Abstract).   Riggs' orthotic stabilizer is "sized to fit the individual heel and to extend forward therefrom approximately two-thirds of the length of the foot to the metatarsal foot region."  Ex. 14, at 2:60-63.

48.     Figures 2-4 of the Riggs patent show the "orthotic stabilizer" and column 2, line 54 describes the stabilizer as made of a foam plastic that is semi-rigid.  Ex. 14.  In particular, Figures 3 and 4 show cross sections of a heel cup with side surfaces inclined more steeply on the inside than on the outside, precisely as shown in the 052 Patent.  Likewise, the lateral flanges on the Riggs patent extend to the metatarsal necks exactly as the Plaintiffs' claimed device.  *See id.* and Ex. 51 (comparing figures from each patent).

49.     Dr. Smith confirms that every detail of the claims of the 052 Patent is replicated in Riggs, which thus invalidates the 052 Patent.  Ex. 45, at ¶¶ 35 and 36 and exs. thereto.

**B.      The Mizuno/Rose Shoes Invalidate the 052 Patent:**

50.     Mizuno is a shoe company based in Japan that manufactures athletic shoes.  Ex. 43, at ¶¶ 1-8.  Long before the filing of the 052 Patent, Mizuno printed catalogs in 1984 and 1987 advertising various shoes and shoe inserts.  *Id.* at ¶¶ 5-6 and ex. B thereto.

51.     Genesco located those advertisements and asked Mizuno for a shoe embodying those inserts.  Mizuno provided such a shoe and confirmed that the insert in the shoe is shown in the Mizuno advertisements from the 1980s.  *Id.* at ¶¶ 4-8 and exs. A-C thereto.

52.     According to Mizuno, many U.S. athletes, including Pete Rose, Ricky Henderson, John Elway, Joe Montana and the U.S. Volleyball Team, wore Mizuno's shoes in the 1980s, as documented in Mizuno's 1987 catalog.  *Id.* at ¶ 9 and ex. D.  Indeed, Genesco located one such shoe, a Mizuno shoe exhibited in the National Baseball Hall of Fame and Museum.   Ex. 44, at ¶¶ 1-9.  Pete Rose wore those shoes in a 1985 game in which he broke Ty Cobb's all-time hitting record.  *Id.* at ¶ 7-9.  The registrar of the Baseball Hall of Fame has authenticated the Rose shoe and confirmed its insert is the same as the insert in the Mizuno shoe.  *Id.* at ¶¶ 10-11.

53.     The Mizuno/Rose shoe and their inserts have been carefully examined by Dr. Smith.  He concludes that the Mizuno/Rose shoe embodies every element of the claims of

16

Plaintiffs' 052 Patent.  Ex. 45, at ¶¶ 37-39.  Accordingly, Dr. Smith appropriately concludes that the Mizuno shoe invalidates the 052 Patent.  *Id.* at ¶¶ 37-39 and exs. thereto.

## ARGUMENT

**I.**      **Summary Judgment Readily Applies to Patent Cases.**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  It is well-established that summary judgment is as appropriate in a patent case as in any other type of case.  *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984).

**II.**      **Genesco Has Not Infringed the 052 Patent.**

**A.**      **Before considering noninfringement, the Court must construe the claims pursuant to the established rules of construction.**

A patent infringement analysis entails two steps:  (1) construing the scope and meaning of the asserted patent claims and (2) applying the construed claims to the accused product.  *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996).  Liability for infringement only arises if <u>every</u> element of a patent claim is found in the accused product.  *Riles v. Shell Exploration and Prod. Co.,* 298 F.3d 1302, 1308 (Fed. Cir. 2002).  The patent owner bears the burden of proving preponderant evidence of infringement and a failure to adduce evidence on any one element of the claims can and should lead to summary judgment of noninfringement.  *See Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1049-51 (Fed. Cir. 2001) (affirming summary judgment of noninfringement where patentee failed to adduce sufficient evidence of infringement).

The first step in the analysis, construction of a patent, is exclusively within the province of the court.  *Markman, supra.*  The language of the claims in a patent defines the scope of the protected invention.  *York Prods., Inc., v. Cent. Tractor Farm and Family Crt.*, 99 F.3d 1568,

1572 (Fed. Cir. 1996).  The focus of and starting point for the analysis is thus the claim language itself.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (noting a heavy presumption that claim terms carry their full ordinary and customary meaning).  Thus, examining relevant dictionaries, encyclopedias and treatises is the first step in determining the ordinary meaning of claim terms.  *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1205 (Fed. Cir. 2002).

Courts should also look to the intrinsic evidence, i.e., the patent and its prosecution history, to confirm or rebut the presumption of ordinary meaning. *Texas Digital Systems*, 308 F.3d at 1204. The presumption in favor of ordinary meaning is overcome when the patentee "has clearly set forth an explicit definition of the term different from its ordinary meaning."  *Id.* at 1204. *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The prosecution history contains the record of all proceedings before the Patent Office leading to the grant of the patent and may include express representations made regarding the scope of the claims.  *Digital Biometrics, Inc., v. Identix, Inc*., 149 F.3d 1335 (Fed. Cir. 1998); *Vitronics Corp.*, 90 F.3d at 1582.  Such representations limit the claims under the doctrine of "prosecution disclaimer," which holds that, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."  *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1324 (Fed Cir. 2003).

### B.    The Narrow Scope of the 052 Patent Claims[4] Results in Multiple Grounds for Summarily Adjudging that Genesco Has Not Infringed.

The 052 Patent uses many medical terms.  As to many of those terms, such as lateral, medial, plantar, etc., the parties do not have substantial disputes.  Dr. Smith provides a clear and

---

[4] Claim 2 is dependent on, and incorporates the elements of, claim 1.  If claim 1 is not infringed, then claim 2 cannot be infringed.  This portion thus focuses solely on claim 1, reproduced in Addendum I.

uncontroversial explication of these terms.[5]  *See* Ex. 45, at ¶ 8.  Thus, only terms as to which the parties have genuine disputes are addressed below.  Absence of any one of the claim elements described below in the accused shoes requires summary judgment for Genesco.  Indeed, as to most of items 1-5 below the essence of the parties' dispute involves no fact issues at all.  Rather, the dispute simply revolves around a legal question:  what is the proper scope of the applicable claim term?  Once that question is resolved, Genesco explains below the facts concerning its accused shoes that render summary judgment appropriate.

     *1.    Genesco's inserts are plainly not "rigid" and it thus has not infringed.*

One of the sharpest, and potentially dispositive, disputes between the parties concerns the meaning of "rigid."  Ordinarily, it means "not bending or flexible; unyielding; stiff and hard."  Ex. 50, at 1156.  Defendants accept this definition.

Plaintiffs do not, seeking instead to rewrite "rigid" to mean "fairly flexible" – the exact opposite of rigid, which ordinarily means inflexible.  *Id*.  This would be legal error.  *McCarty v. Lehigh Val. R.R.,* 160 U.S. 110, 116 (1895) ("[I]f we once begin to include elements not mentioned in the claim in order to limit such claim . . ., we should never know where to stop.").  Nor is there justification for Plaintiffs' position.

The specification does not attribute a novel (or, in this instance, counter-intuitive) definition of the word "rigid."  Plaintiffs nevertheless say that rigidity includes semi-rigid.  *See* Ex. 53, at 3.  Plaintiffs point to one reference in the 052 Patent that discusses a semi-rigid device.  Ex. 1, at 4:67-5:9.  But the language actually begins with "semi-rigid" and goes on to say the

---

[5] Dr. Smith's explanation of the medical terms is about the only type of "extrinsic" evidence on construction of patent claims allowed under the governing law.  *See Vitronics, supra* (explaining distinction between preferred "intrinsic" evidence for claim construction and less preferred "extrinsic evidence); *Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709 (Fed. Cir. 1999) ("trial courts generally can hear expert testimony for background and education on the technology implicated by the presented claim construction issues").

heel cup is "<u>more rigid and stiff</u>" with "somewhat less stiffness and rigidity towards the forefoot." *Id*. (Emphasis added).  At best, this merely bolsters Genesco's construction and the ordinary meaning.

In any event, the controlling evidence here is that plaintiffs amended their original claims to add the word "rigid."  They could have said "semi-rigid" or fairly flexible.  They didn't. Instead, at the suggestion of the patent Examiner, Plaintiffs amended the claims to require "rigidity."  Only then was the 052 Patent allowed.  Statement of Facts ("SOF"), at ¶ 9.

Subject matter disclosed but not claimed in a patent is dedicated to the public.  *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558 (Fed. Cir. 1991).  In *Unique Concepts*, the patent related to the assembly of border pieces used to attach a fabric wall covering to a wall.  *Id*. at 1562-63. The plaintiffs argued that "right angle corner border pieces" really meant "mitered linear border pieces" based on the specification referring to such pieces as an alternative.  *Id*.  Reasoning that 35 U.S.C. § 112 requires patentees to particularly point out and distinctly claim the invention, the court rejected plaintiff's construction because it would "encourage an applicant to escape examination of a more broadly-claimed invention by filing narrow claims and then, after grant asserting a broader scope of the claims based on a statement in the specification of an alternative never presented in the claims for examination."  *Id*.

Under both *Unique Concepts* and other controlling case law that gives effect to claim amendments, Plaintiffs cannot rewrite "rigid" to mean "semi-rigid."  Plaintiffs had to claim only a "rigid" orthotic device in order to obtain their patent and they must be held to that claim now.

<u>Genesco's Inserts</u>:  Plaintiffs do not dispute that Genesco's accused inserts are all soft, cushion inserts made from a material designed to be flexible and yieldable.  SOF, at ¶¶ 11-12. Plaintiffs claim only that their 052 Patent covers such soft inserts, asserting that rigid "really"

means "semi-rigid."  That is a spurious claim.  Proper construction of the 052 Patent limits its scope to only "rigid" inserts, which Genesco's are not – a fact Plaintiffs have not and cannot dispute.

  2.  *Genesco's inserts are not medially off set and laterally tilted.*

Plaintiffs' initial patent application merely required the insert to have flanges that created 5 degrees of tilt to prevent hyperpronation.  The tilt did not need to be created in a particular manner.  That changed, however, when Plaintiffs amended their claims to require the heel cup to be "medially offset and laterally tilted" sufficiently to maintain the foot in 5 degrees of tilt, or varus.  This was repeatedly urged to be a significant limitation.

It is.  Only it does not have the meaning attributed it by Plaintiffs.  Ex. 9, at 3-4; ex. 53, at 3-4.  Medial refers to the side of the heel cup in which the inside side of the foot rests.  Off set means "something that is set off…from something else."  Ex. 50, at 941.  This doesn't help much, but the specification does.  It says that the off set "is accomplished by shaping the cup so that the medial leg (6) of the orthotic device rises more steeply from the bottom of the cup (1) then [sic, than]



FIG.9

does the lateral leg (2)."  Ex. 1, at 5:15-17.   The "laterally tilted" language simply confirms that the rise in the inside flange creates a tilt or "slant" (ex. 50, at 1400) toward the outside of the foot.  This is exactly what Figure 9 of the 052 Patent reproduced above shows: Medially off set and laterally tilted thus refers to a heel cup that has a thickened inside flange that rises the heel cup toward the inside of the orthotic.

In prosecution, Plaintiffs vigorously argued that this "medially offset" or thickened shape was different.  They said the prior art only disclosed flat heel cups in which the heel of the

21

wearer would be tilted by an external wedge.  *Id.* at 5.  This was said to be dramatically different from Plaintiffs' orthotic that was "intrinsically" medially off set and laterally tilted by its internal contour.  *Id.* at 8.  In short, a "medially offset and laterally tilted" heel cup is thicker on the inside and rises more steeply from a flat surface to form an arch that tilts the heel outward.

<u>Genesco's Inserts</u>: This does not describe Genesco's inserts.  What Plaintiffs say is the heel seat of the accused Genesco insert <u>is flat</u> and <u>symmetrical</u>.  SOF, at ¶¶ 12-14.  Neither Genesco's inserts nor the shoes they go in are off set or thickened on one flange to create "varus" or foot tilt.  *Id.* at ¶¶ 35-38, 43-45.  Contrary to the orthotic device described in the 052 Patent, the inside and outside flanges of the accused insert are the same height and thickness.  The medial flange does not rise from the bottom of the insert "more steeply" than the lateral to create the required off set.  Thus, there can be no infringement.

> 3.    *Genesco's flat inserts and standard men's shoes do not create 5 degrees of varus or tilt.*

Both parties agree that the 052 Patent plainly requires a heel cup that is "medially offset and laterally tilted by a sufficient amount to maintain the calcaneus <u>in approximately 5 degrees of varus</u>".  As pointed out, *supra*, according to Plaintiffs' arguments to the Patent Office and statements to Genesco, this is a critical limitation.

Foot tilt or varus, however, is not created by the accused Genesco shoes.  SOF, at ¶¶ 35-38, 43-45.  This is confirmed by measuring the degrees of rotation of a foot when wearing a Johnston & Murphy shoe containing the insert.  Dr. Smith, unlike Plaintiffs, did this.  The accused inserts consistently caused *de minimus*, if any, heel tilting or rotation and certainly not anywhere close to "approximately 5 degrees."  *See* Ex. 45.  Dr. Smith observed the subjects walking both barefooted and while wearing shoes containing the accused insert and noticed no rotational effect by the insert.  Thus, the claim element requiring the heel cup to be laterally tilted

by a sufficient amount to maintain the calcaneus in approximately 5 degrees of varus is also missing from the accused device.

Dr. Schoenhaus' belated theory that the "last" used to make the accused shoes creates the tilt was never based on anything other than his speculation.  That theory has been thoroughly discredited and debunked.  The Wicklow III lasts used to make the accused shoes are identical to the prior art Copperstone type last Genesco had developed long before Plaintiffs' patent.  SOF, at ¶¶ 29, 35 and 36.  The Wicklow III lasts have been shown by Mr. Smith to embody zero tilt or angulation.  *See* Ex. 40, at ¶¶ 18-26.  The accused shoes have uniform heels that sit squarely on the ground, are interchangeable for right and left shoes and unequivocally demonstrate that there is no tilt.  SOF, at ¶ 44.  The accused shoes are dramatically different in appearance from the "prototype" shoe that has an angled seam on the heel that the accused shoes lack.  SOF, at ¶¶ 42 and 44.  The subjects Dr. Smith tested while wearing accused shoes and inserts experienced virtually no rotation of the calcaneus when compared to their barefoot measurements.  Dr. Smith then tested Genesco's inserts in other standard, commercially available shoes such as Rockport, Cole Haan and Timberland.  No tilt was created. Finally, when Dr. Smith placed the inserts of the competitors' shoes in Genesco's accused shoes, no tilt was created, even though the competitors' inserts were very similar to Genesco's accused inserts.  *See* Ex. 45.

By contrast, Plaintiffs have pointed to no objective evidence that the accused shoes tilt a customers' foot.  They have no tests, no measurements.  They have only pet theories and personal observations – none of which are even documented.  SOF, at ¶¶ 32-33.  That is insufficient to meet their burden of showing infringement and not enough to avoid summary judgment.

ATLLIB01 1671975.9

4.  *Genesco's inserts lack continuously high flanges that extend the required distance.*

The 052 Patent requires "high medial and lateral flanges which extend continuously high … substantially to the first and fifth metatarsal necks."  "Flanges" are defined as "a projecting rim or collar on a wheel, pipe, etc. to hold it in place, give it strength, guide it, or attach it to something else."  Ex. 50, at 513.  In the 052 Patent, flanges are the structures extending vertically from the bottom of the heel cup and longitudinally along the side of the heel cup to hold the sides of the foot in place.

"High" refers to the vertical height of the flanges.  But, how high is that?  Apparently, the flanges must be at least high enough to prevent lateral drift. Ex. 1, at 4:63-66.  The height necessary to accomplish this function is depicted in the Jay article referenced by Plaintiffs in the prosecution history.  According to Plaintiffs, the Jay article includes pictures showing that the orthotic device disclosed therein is "high" in the heel cup region <u>only</u>.  The highest point of the flanges depicted in the Jay article is described as being in the "malleolar region which is the ankle."  Ex. 7, at 5.  Further, the height of the flanges must be "uniform," or  continuously high substantially to the metatarsal necks, as that is what Plaintiffs amended their claims to recite and told the Patent Office.  *Id.* at 6, ex. 8, at 3.

Plaintiffs now say the flanges don't have to be as high or as long as they told the Patent Office.  They are wrong.  They told the Patent Office that flanges that taper sooner than the first and fifth metatarsals heads could not prevent foot drift.  Ex. 7, at 6.  Flanges must remain "high" and not taper until they reach almost to the first and fifth metatarsal necks; flanges that taper earlier are outside of the 052 Patent.  Thus, a "continuously high" flange means:  the orthotic structure extending vertically from its bottom to just below the talus and maintaining the height to the metatarsal necks in order to prevent lateral drift.

24

Genesco's Inserts:  Genesco's inserts don't have flanges that meet these definitions.  Ex. 45, at ¶ 24; SOF, at ¶¶ 11-13.  Plaintiffs themselves recognized this when they were asked about a Genesco shoe they had accused of infringement.  Dr. Schoenhaus admitted that the "Dean" shoe (ex. 31) did not infringe because its flanges were too short (ex. 24, at 219:3-24), while Dr. Jay could not confirm infringement because he was concerned about the shortness of the flange.  Ex. 23, at 300:7-301:5; 315:4-10.

> 5.    *Genesco's inserts are not "orthotic devices" and thus cannot prevent hyperpronation or apply the stabilizing forces the 052 Patent claims.*

The 052 Patent covers only an "orthotic device" that "prevent[s] hyperpronation" and applies "stabilizing force" to the foot to do so.  Genesco's common, flat cushion insert doesn't meet the definitions of each of those claim elements, set forth below.  SOF, at ¶¶ 11-13.

Orthotic Device[6]:   "Orthotic" is "the science of developing and fitting surgical devices designed to activate or supplement a weakened or atrophied limb or function."  Ex. 50, at 957.  The orthotic "device" described in the 052 Patent is designed to prevent hyperpronation.  Ex. 1, at 6:29-30.  Ordinary meaning alone says that the "orthotic device" described is a device that supplements a weak foot to prevent hyperpronation.

Plaintiffs' contrary construction of orthotic to mean it is any part of the shoe must be rejected.  During prosecution, Plaintiffs explicitly argued that the prior patents used only an "extrinsic wedge on the bottom of the heel cup which is between the surface of the shoe and the orthotic itself." Ex. 7, at 7 (emphasis added).  Where Plaintiffs previously said the wedge in the prior art shoes would not be part of the orthotic device, they cannot now argue parts of the shoe are within the meaning of "orthotic device."

---

[6] This term appears in both the body and preamble, but is an essential element of the claim.  *See Gen. Elec. Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1361-62 (Fed. Cir. 1999); *In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994) (claim preamble may limit claim).

ATLLIB01 1671975.9

Preventing hyperpronation:   "Prevent" means "to stop or keep (from doing something); make impossible by prior action; hinder[7]."  Ex. 50, at 1025.  "Hyper" is "over, above, more than normal, excessive" (*id*. at 663), while "pronation" means rotation of the medial bone in the mid tarsal region of the foot inward and downward so that in walking the foot tends to come down on its inner margin.  Ex. 54, at 942.

Despite the simplicity of the language and the ordinary meaning thereof, Plaintiffs interpret "preventing hyperpronation" to mean "to counter or impede the forces acting to put the foot in excessive pronation."  Ex. 53, at 2-3.  According to Plaintiffs, one skilled in the art would understand that eliminating the symptoms of pronation is not the same as eliminating pronation. *Id*.  That may be true, but the claim does not recite an orthotic device for preventing the symptoms of pronation; it claims a device that prevents the act of hyperpronation.

Not even the 052 Patent's specification supports Plaintiffs' strained interpretation of the claim term "preventing hyperpronation."  Plaintiffs point to the background of the invention where the patentee refers to a need for an in-shoe device modification to control hyperpronation and prevent symptoms from developing as support for its desired interpretation.  Ex. 1, at 1:19-23.  This language does not provide a novel meaning of the term "preventing hyperpronation." To the contrary, it evidences that Plaintiffs said what they meant in the patent claim.  Plaintiffs could have stated that the orthotic device "controlled" hyperpronation or "prevented symptoms of hyperpronation from developing."  They chose to claim an orthotic device for *preventing hyperpronation.  See Unique Concepts*, *supra*.

Stabilizing Force:  The 052 Patent describes a "high medial flange applying a stabilizing force" to a part of the foot, the "navicular."  Plaintiffs, in essence, say that the flange just has to

---

[7] Plaintiffs similarly ignore the plain meaning of prevent  when construing the phrase "prevent transverse drift." See Ex. 53, at 8. They seek to morph "prevent" into "counter," a result that is impermissible for the same reasons stated here.

ATLLIB01 1671975.9

rest against that part of the foot.  But that is not what they argued in prosecution, when they repeatedly stressed the importance of the forces applied by their device.  Ex. 7 at 6. Accordingly, the ordinary meaning controls and this phrase means that the medial flange applies an upward force to the inside bottom of the foot to stabilize it.

Genesco's Inserts:  Common sense confirms that Genesco's inserts are pieces of flexible foam put in the shoe to increase comfort.  SOF, at ¶¶ 11-12.  They do not support or brace a weak, *e.g.,* hyperpronating, feet.  *Id.* at ¶ 12. Genesco's insert was dictated not by orthotic concerns but by customers demand for more cushioning.  *Id.* at ¶¶ 15-18.  Indeed, Genesco's inserts are off-the-shelf inserts that should not support or tilt the foot because the vast majority of people who buy Genesco's mass marketed shoes do not need, and might be harmed by, such tilting.  *Id.* at ¶ 27; Ex. 45.  The bottom line is that Genesco's cushion insert is a piece of foam added for comfort, not orthotic correction, not to prevent hyperpronation, not to apply a stabilizing force to the "navicular" and not to prevent foot drift to the outside.  *See* Ex. 45; SOF, at ¶¶ 11-12, 16.

### C.    Plaintiffs' failure to allege or adduce evidence of equivalents infringement precludes any such arguments at this late date, especially given their multiple and presumptively limiting claim amendments.

Patents may also be infringed under the "doctrine of equivalents."  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 40 (1997).  Here, however, Plaintiffs' sworn interrogatory responses assert only literal infringement.  Ex. 53, at 10-12.  While Plaintiffs tried to "reserve" the right to argue equivalents infringement, *id*. at 12, such a reservation is ineffective.  The Federal Rules of Civil Procedure do not allow parties to rely, upon motion or at trial, on previously undisclosed information.  *E.g.,* Fed. R. Civ. P. 37(c)(1).   In *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647 (Fed. Cir. 1994), Nike appealed a summary judgment of noninfringement.  Nike asserted the lower court had erred in refusing to allow Nike

27

to submit evidence of equivalents infringement.  The Federal Circuit rejected that argument given Nike's pre-motion failure to disclose its contentions.

Here, as in *Nike*, Plaintiffs were ordered to supplement their interrogatory responses and provide all their infringement contentions.  Plaintiffs failed to do so.  Plaintiffs cannot do so now and, even if they could, the prosecution history of their patent forecloses such arguments.  They made multiple amendments to their patent claims and stressed the materiality of those amendments in their arguments seeking to distinguish close prior art.  Under these circumstances, controlling law forecloses assertion of infringement under the doctrine of equivalents.  *E.g., Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., 535 U.S. 722 (2002).

## III.    Defendants Are Entitled to Summary Judgment Because the 052 Patent is Invalid

### A.    Patentable inventions must be new and nonobvious.

To merit patent protection, an invention must be new or novel.  This requirement is codified in 35 U.S.C. § 102, which renders an issued patent invalid if every element of the claimed invention is present in a single "prior art" reference.  *Schering Corp. v. Geneva Pharms.,* 339 F.3d 1373, 1379 (Fed. Cir. 2003).  Prior art is typically a publication describing the patented invention or other evidence of knowledge, use, or sale in the United States of the patented invention by others either prior to the date of invention or more than one year prior to the date that the patent application was filed.  *See* 35 U.S.C. §§ 102(a), (b), (g).  In assessing a prior art reference, the focus is on whether the reference teaches to one or ordinary skill in the art all of the elements.  *See, e.g., Crown Operations Int'l, Ltd. v. Solutia Inc.,* 289 F.3d 1367, 1375 (Fed. Cir. 2002).  If such a prior art reference exists, it is said to "anticipate" the claimed invention. Section 102 identifies numerous circumstances under which the claimed invention can be anticipated.  Genesco need only show one basis for anticipation to invalidate the 052 Patent. *Beckson Marine, Inc. v. NFM, Inc.,* 292 F.3d 718, 725 (Fed. Cir. 2002).

28

Under 35 U.S.C. § 103, a patent claim is also invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *Graham v. John Deere Co.,* 383 U.S. 1, 13 (1966). For purposes of assessing invalidity under both § 102 and § 103, the presumed date of invention of the 052 Patent is January 3, 1991, the filing date of the application for the 052 Patent. *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed. Cir. 1986).

The 052 Patent is presumed valid.  35 U.S.C. § 282.  To rebut this presumption, Genesco must show clear and convincing evidence that the invention was not new (i.e., anticipated under 35 U.S.C. § 102) or was obvious under 35 U.S.C. § 103 at the time of invention.  Nevertheless, invalidity can be and often is decided on summary judgment.  *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed. Cir. 1999).  Genesco is entitled to summary judgment if no material issues of fact exist as to whether the prior art either anticipates or renders obvious the claims of the 052 Patent.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g,* 200 F.3d 795, 807 (Fed. Cir. 1999).  This burden is easily met in this case.

B.     **Plaintiffs' Construction of the 052 Patent Results in its Claims Covering, and Being Invalidated by, Prior Art Sequoia, Copperstone and Frelonic Inserts and Shoes.**

From the genesis of this suit, Genesco has been mystified by the basis for Plaintiffs' claims of infringement.  Genesco, upon being sued, reviewed the prosecution history of the 052 Patent and noted a number of prior art patents that appeared to depict inserts that looked just like the industry standard, generic cushion inserts in Genesco's accused shoes.  For instance, compare one of Genesco's accused inserts (left photo, ex. 41, at ex. A) with Figure 4 from a prior art patent to Cohen (right, ex. 39):





This is a critical issue because Plaintiffs' patent "claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) (citations omitted). This is a bedrock principle of patent law, extending back to early Supreme Court pronouncements that: "A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement." *Id.*, citing *Sterner Lighting, Inc. v. Allied Elec. Supply, Inc.*, 431 F.2d 539, 544 (5th Cir. 1970) and *White v. Dunbar*, 119 U.S. 47, 51 (1886).

Genesco thus asked Dr. Jay to compare the Cohen patent with Genesco's accused insert and explain why Plaintiffs can simultaneously contend (1) the Genesco insert trespasses on their patent, but (2) the Cohen insert does not. Ex. 23, at 426:1-434:18. The Court can see from this exchange that no answer was ever provided. Dr. Jay instead claimed that he needed an actual insert like the one depicted in the Cohen patent to answer.

This claim is spurious,[8] but Genesco thus searched for, obtained and presented to Plaintiffs actual, prior art inserts -- the Copperstone and Frelonic inserts. SOF, at ¶¶ 18,19-26. Genesco asked for an explanation as to the differences between the accused inserts and those prior art inserts. *See* Defendants' Motion to Compel Responses to Genesco's Fourth Set of Interrogatories (docket entry no. 39). Genesco asked Plaintiffs to explain why the accused

---

[8] Exhibit 39 came from Dr. Jay's own files and has his handwritten note from 1991 characterizing it as very different from his invention because of an absence of varus, transverse plane motion and flanges that were too short. Ex. 23, at 421:19-424:13.

inserts infringe, even though they appear so similar to the prior art inserts that the Plaintiffs claim are different.  Once again, even after moving to compel Plaintiffs' answer to that question, no answer has been forthcoming.

The truth is that no satisfactory answer exists.  Any conceivable reading of Plaintiffs' patent so as to cover Genesco's accused shoes would similarly ensnare the proven prior art.  Dr. Smith has demonstrated this and other witness agree.  Ex. 45, at ¶¶ 35-44 and exs. F-I thereto.  Under black letter patent law: "'[T]hat which infringes if later anticipates if earlier,'" *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1573 (Fed. Cir. 1986) (citing *Peters v. Active Mfg. Co.,* 129 U.S. 530, 537 (1889)), and the Copperstone, Frelonic and Sequoia shoes and inserts indisputably were earlier.  SOF, at ¶¶ 18-26.  In short, because the earlier inserts are covered by the 052 Patent claims as Plaintiffs construe those claims, the claims are necessarily invalid.

### C.    Either of the Riggs Patent or Mizuno/Rose Shoe Anticipate and thus Invalidate the 052 Patent.

Even under a correct construction of the 052 Patent, it is invalid.   Its claims are fully taught and thus "anticipated" by either of the Riggs patent or Mizuno/Rose shoe.

There is no dispute that the Riggs patent is prior art to Plaintiffs' 052 Patent under 35 U.S.C. § 102.  Nor can Plaintiffs dispute the prior art status of the insert in the Mizuno shoe that is identical to the insert depicted in 1984 and 1987 printed publications.  That is especially so in light of the evidence concerning Pete Rose's Mizuno shoe that was known and used within the U.S. in 1985.

The Riggs patent explicitly describes and teaches each material feature of the 052 Patent claims.  Its drawings are very similar to the drawings in the 052 Patent.  Dr. Smith has compared Riggs to the claims and explained why it anticipates each claim of the 052 Patent.  Similarly, the Mizuno insert actually replicates and embodies the elements of each claim of Plaintiffs' 052

31

Patent.  The structure and characteristics of the Riggs patent and Mizuno shoes cannot genuinely be disputed.  Plaintiffs thus cannot point to any genuine factual issues to preclude summary judgment.

> **D.     Even if Plaintiffs Could Identify Differences between the Prior Art and Their Claims, the 052 Patent is Invalid for Obviousness.**

Because "[o]bviousness is a legal conclusion based on factual determinations," *Aktiebolaget Karlstads Mekaniska Werkstad v. United States Int'l Trade Comm'n*, 705 F.2d 1565, 1575 (Fed. Cir. 1983), this Court may weigh the underlying factual factors and, if proper, grant summary judgment on invalidity so long as there are no genuine issues of material fact as to the factors themselves.  *See e.g., Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 719 (Fed. Cir. 1991); *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 762 (Fed. Cir. 1988).  The Federal Circuit has thus observed that "[a]ll of our precedent holds that, where the only issue is, as here, the application of the statutory standard of obviousness (35 U.S.C. § 103) to an established set of facts, there is only a question of law to be resolved by the trial judge."  *Newell*, 864 F.2d at 762.

*Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) requires consideration of several factors to determine obviousness under 35 U.S.C. § 103: (1) scope and content of prior art, (2) level of ordinary skill in the art, and (3) differences between the claimed invention and the prior art.  Each of these factors aligns to demonstrate obviousness.

The scope and content of the prior art:  The scope of the relevant prior art includes the Riggs patent, which is aimed at preventing hyperpronation, as well as the Mizuno shoe.  Each of Riggs and the Mizuno shoe depicts an insert that is tilted, has long medial and lateral flanges and has a deep heel seat that cups the foot and is off set to create the required tilt.

The level of ordinary skill in the art:  In determining the skill level, the Court may consider the educational level of the inventor, and the educational level of active workers in

field.  *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983).

Plaintiffs, the putative inventors, are trained podiatrists with medical degrees and, accordingly,

the skill level in the relevant art is high.

The differences between the claimed invention and the prior art:  The Patent Examiner

explained that the only difference between the prior art Jay article and the 052 Patent lay in the

length of the flanges.  Ex. 8, at 4. The Riggs patent and Mizuno shoe insert have the appropriate

length flanges.  Indeed, as noted earlier, Genesco submits there are virtually no material

differences between the 052 Patent and either of the Riggs patent or Mizuno shoe.   The only one

of note concerns the rigidity of the insert material.  But that is insufficient to avoid finding

obviousness given that persons skilled in this art routinely used different materials to make the

same structural inserts.  Ex. 45, ¶ 38; Ex. 42, at ¶ 12.

In weighing the *Graham* factors, this Court must determine whether the prior art "would

'suggest the desirability, and thus the obviousness, of making the combination.'"  *Alco Standard*

*Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490, 1498 (Fed. Cir. 1986).  The suggestion to make the

combination need not be explicit, so long as it "may be fairly inferred from" a prior art reference.

*In re Gorman*, 933 F.2d 982, 986-87 (Fed. Cir. 1991).

The Riggs patent itself notes that its "orthotic stabilizer" is aimed at treating pronation.

Dr. Smith agrees and explains that the Mizuno shoe is aimed at the same end.  He also notes that

it is well known in his field to use harder materials to control pronation.  Thus, the references

themselves provide ample motivation to close any conceivable gap between the 052 Patent and

either of Riggs or the Mizuno/Rose shoe.  Accordingly, as a matter of law, the claims of the 052

Patent are invalid as obvious.

## CONCLUSION

There is no justification for Plaintiffs' lodging a patent infringement claim against Genesco.  The soft, flexible and flat accused inserts do not meet the requirements of Plaintiffs' patent.  Genesco has done nothing wrong here -- to the contrary, its shoes embody industry standard inserts that were used long before Plaintiffs' application for patent.  Plaintiffs know this and have sought to avoid answering Genesco's reasonable questions about the very basis for this suit, willfully ignore the true scope of their patent and advocate diametrically inconsistent and unsustainable positions.  On the record presented, Genesco respectfully requests that the Court grant summary judgment of noninfringement, invalidity or, preferably, both.


Thomas B. Kenworthy
(I.D. No. 18418)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania  19103
215 963-5702 telephone
215 963-5001 facsimile

  /s/Mitchell G. Stockwell_____
Mitchell G. Stockwell
Georgia Bar No. 692912
Tywanda L. Harris
North Carolina Bar No. 26858
KILPATRICK STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, GA 30309-4530
(404) 815-6500


ATTORNEYS FOR DEFENDANTS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HAROLD SCHOENHAUS           )
and                         )
RICHARD M. JAY              )
          Plaintiffs,       )
                            )
     vs.                    )          Civil Action No. 03-372
                            )
                            )
GENESCO, INC.               )
and                         )
JOHNSTON & MURPHY, INC.     )
          Defendants.       )

CERTIFICATE OF SERVICE

        This is to certify that on this 8th day of March 2004, a copy of the foregoing BRIEF IN
SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF
NONINFRINGEMENT AND INVALIDITY was served as indicated below upon:


Via First Class Mail:              Via First Class Mail:

Grant S. Palmer                    Charles Wolfe
Todd A. Schoenhaus                 BLANK ROME LLP
BLANK ROME LLP                     600 New Hampshire Avenue, N.W.
One Logan Square                   Washington, D.C.  20036
Philadelphia, PA  19103-6299       (202) 772-5800
(215) 569-5500


                                   /s/  Mitchell G. Stockwell
                                   Mitchell G. Stockwell

ATLLIB01 1671975.9